IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMCA-032

Filing Date: February 24, 2011

Docket Nos. 29,136 and 29,336
(consolidated)

CONNIE LEA GIBSON ANDREWS,
Individually and as Personal Representative
of TOMMY LINDELL ANDREWS,
Deceased,

 Plaintiff-Appellant,

v.

UNITED STATES STEEL CORPORATION,
CHEVRON U.S.A., INC., CONOCOPHILLIPS
COMPANY, and RADIATOR SPECIALTY
COMPANY,

 Defendants-Appellees.

APPEAL FROM THE DISTRICT COURT OF CHAVES COUNTY
Gary L. Clingman, District Judge

Tucker Law Firm, PC
Steven L. Tucker
Santa Fe, NM

Marion J. Craig, III PC
Marion J. Craig, III
Roswell, NM

Heard, Robins, Cloud & Black, LLP
J. Robert Black
Houston, TX

Daryl L. Moore, P.C.
Daryl L. Moore
Houston, TX

1

for Appellant

Hinkle, Hensley, Shanor & Martin, L.L.P.
Richard E. Olson
Rebecca Nichols Johnson
Roswell, NM

Forman, Perry Watkins Krutz & Tardy, L.L.P.
Phillip S. Sykes
Lea Ann Smith
Tim Gray
Jackson, MS

Coats Rose
James M. Riley, Jr.
Stacy K. Yates
Houston, TX

Abrams, Scott & Bickley, L.L.P.
Robert P. Scott
Houston, TX

for Appellees

## OPINION

**VIGIL, Judge.**

**{1}**    This is a toxic tort case.  The district court granted Defendants' motion to exclude the testimony of Plaintiff's experts pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *State v. Alberico*, 116 N.M. 156, 861 P.2d 192 (1993), granted summary judgment in favor of Defendants, and awarded Defendants expert witness fees and costs.  We affirm.

## BACKGROUND

**Facts**

**{2}**    Decedent worked as a farmer and rancher for approximately twenty-four years, from 1947 through 1971.  During this time, Decedent worked with equipment and machinery and various products associated with the operation, cleaning, and maintenance of the equipment and machinery, which included gasoline and a product known as Liquid Wrench.  Decedent used the gasoline to clean machinery parts in the field and in his shop, and he used the Liquid Wrench to loosen rusted and frozen equipment parts.  In November 2004, Decedent was diagnosed with Myelodysplastic Syndrome (MDS), also known as acute mylegenous leukemia (AML), and he died on February 5,

2005. Plaintiff is the surviving widow of Decedent, and she sued Defendants, alleging that benzene in the gasoline and Liquid Wrench they supplied or manufactured caused Decedent's MDS and death.

**Summary Judgment Proceedings in the District Court**

{3}	Plaintiff designated Dr. Mark Nicas, an industrial hygienist, as her expert to estimate Decedent's exposure to benzene from Defendants' products. In addition, Plaintiff designated Dr. Frank Gardner, a hematologist, to testify that Decedent's form of MDS was caused by his exposure to the benzene.

{4}	Defendants filed a motion to exclude the testimony of Dr. Nicas and a motion to exclude the testimony of Dr. Gardner. These motions were supported by excerpts from depositions, exhibits from depositions, affidavits of witnesses, and affidavits of experts, with references to pertinent scientific literature, studies, and techniques. Plaintiff responded to these motions, supported in the same way. After Defendants filed their reply in support of the motions, the district court held a *Daubert/Alberico* evidentiary hearing at which the parties were given an opportunity to present additional evidence in support of their respective positions. We commend the parties and the district court for their full development of an intelligent and understandable record of the complex issues presented.

{5}	Defendants also filed a motion for summary judgment on causation alleging that the methodology used by each expert was fatally flawed, and their opinions were therefore inadmissible under Rule 11-702 NMRA. On this basis, Defendants contended they were entitled to summary judgment because, "[o]nce the testimony of Plaintiff's experts is excluded, there is no evidence to support causation in this case."

{6}	The district court ruled that the testimony of Dr. Nicas and Dr. Gardner was inadmissible, filed findings of fact and conclusions of law, and granted summary judgment in favor of Defendants. On appeal, Plaintiff contends that the district court abused its discretion in striking the testimony of Dr. Nicas and Dr. Gardner. Thus, Plaintiff asserts, genuine issues of material fact exist on diagnosis and causation, and Defendants were not entitled to summary judgment. Plaintiff also challenges the award of expert witness fees and costs.

**DISCUSSION**

{7}	The primary issue in this case is whether Defendants were entitled to summary judgment. In deciding this question, we must determine whether the district court abused its discretion in striking the testimony of Dr. Nicas and Dr. Gardner under *Daubert/Alberico*, because without their testimony, Plaintiff cannot establish a prima facie case. We also discuss whether the district court abused its discretion in the award of expert witness fees and costs.

**I.	The Summary Judgment Award**

{8}	To determine whether summary judgment was proper, we discuss: (A) proof of causation in a toxic tort case; (B) Rule 11-702 and the application of *Daubert/Alberico*; (C) our standard of

3

review of a district court order excluding expert witness testimony under *Daubert/Alberico*; (D) the district court order excluding the testimony of Dr. Nicas; and (E) the district court order excluding the testimony of Dr. Gardner.

**A.      Proof of Causation in a Toxic Tort Case**

**{9}**      "Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996).  Therefore, to establish cause in a toxic tort case, the evidence must show both "general causation" and "specific causation." *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir. 2005) (discussing causation in toxic tort cases in terms of general causation and specific causation).  "General causation is whether a substance is capable of causing a particular injury or condition in the general population and specific causation is whether a substance caused a particular individual's injury." *Id.* at 881; *see also Federal Judicial Center, Reference Manual on Scientific Evidence*, *Reference Guide on Medical Testimony*, 481, 483 (2d. ed. 2000) (stating that "[g]eneral causation is established by demonstrating (usually by reference to a scientific publication) that exposure to the substance in question causes (or is capable of causing) disease" and that "[s]pecific, or individual, causation is established by demonstrating that a given exposure is the cause of an individual's disease").

**{10}**      These principles were enunciated by Dr. Richard D. Irons in an affidavit filed on behalf of Defendants.  As a toxicologist with an extensive background in hematology, he said:  "[I]n order to evaluate the potential risks of adverse health effects associated with exposure to a drug or chemical one has to know the actual dose of the substance that is absorbed and compare that dose to those shown to cause adverse health effects as well as to doses that have not been shown to result in adverse health effects."

**B.      Rule 11-702 NMRA and the Application of *Daubert/Alberico***

**{11}**      The admission of all expert testimony in our courts is governed by Rule 11-702, which is entitled: "Testimony by experts."  The rule states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

The three prerequisites for the admission of expert testimony under the rule are:  (1) the witness must be qualified as an expert; (2) the specialized testimony must assist the trier of fact; and (3) the expert witness testimony must be limited to scientific, technical, or other specialized knowledge in which the witness is qualified. *Alberico*, 116 N.M. at 166, 861 P.2d at 202.  The burden is on the party offering the evidence to satisfy these requirements. *State v. Morales*, 2002-NMCA-052, ¶¶ 21, 23, 132 N.M. 146, 45 P.3d 406.

**{12}**      The parties do not dispute the qualifications of Dr. Nicas and Dr. Gardner, nor is there a dispute that their testimony, if admissible, would assist the trier of fact.  The dispute in this case

centers on whether the opinions of Dr. Nicas and Dr. Gardner are reliable and therefore admissible as scientific knowledge under *Alberico's* third prerequisite. *See State v. Fuentes*, 2010-NMCA-027, ¶ 23, 147 N.M. 761, 228 P.3d 1181, *cert. denied*, 2010-NMCERT-002, 147 N.M. 704, 228 P.3d 488 (stating that the reliability requirement for the admission of scientific evidence under *Daubert* implicates the third prerequisite).

**{13}** Where expert testimony concerns scientific knowledge, the proponent of the testimony must establish the reliability of the science and methodology on which it is based. In *Alberico*, 116 N.M. at 165-68, 861 P.2d at 200-04, our Supreme Court abandoned the "general acceptance" test of *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), in favor of the more flexible *Daubert* test for determining if expert opinion evidence involving scientific knowledge is reliable and therefore admissible under Rule 11-702. In adopting this test, our Supreme Court "established that it is error to admit expert testimony involving scientific knowledge unless the party offering such testimony first establishes the evidentiary reliability of the scientific knowledge." *State v. Torres*, 1999-NMSC-010, ¶ 24, 127 N.M. 20, 976 P.2d 20. The party proposing to introduce expert scientific testimony into evidence must satisfy the threshold requirement for admissibility; namely, that the testimony is reliable because it is grounded in established scientific principles or methods. *See Alberico*, 116 N.M. at 167-68, 861 P.2d at 203-04 (discussing that our courts consider "whether the scientific technique is based upon well-recognized scientific principle and whether it is capable of supporting opinions based upon reasonable probability rather than conjecture"). "[I]n New Mexico, evidentiary reliability is the hallmark for the admissibility of scientific knowledge." *Torres*, 1999-NMSC-010, ¶ 26.

**{14}** The proponent of the scientific evidence is required to establish by a preponderance of the evidence that the testimony is reliable, and therefore admissible, but not that the testimony must be believed. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). To determine whether the proposed expert testimony is reliable, the district court considers a non-exclusive list of factors. These include: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation; (4) whether the theory or technique has been generally accepted in the particular scientific field; and (5) whether the scientific technique is based upon well-recognized scientific principle and whether it is capable of supporting opinions based upon reasonable probability rather than conjecture. *State v. Anderson*, 118 N.M. 284, 291, 881 P.2d 29, 36 (1994).

## C.    Standard of Review

**{15}** Whether evidence involves scientific knowledge, which must satisfy the standard of evidentiary reliability set forth in *Daubert/Alberico*, presents a question of law that is reviewed de novo. *Torres*, 1999-NMSC-010, ¶ 28. The district court's application of the *Daubert-Alberico* factors is reviewed for abuse of discretion. *State v. Tollardo*, 2003-NMCA-122, ¶ 16, 134 N.M. 430, 77 P.3d 1023. Moreover, when all the applicable factors are considered, the admission or exclusion of the expert scientific testimony is within the discretion of the district court and will not be reversed on appeal absent a showing of abuse of that discretion. *Alberico*, 116 N.M. at 169, 861 P.2d at 205.

**D.      Opinion of Dr. Nicas**

**{16}**    Plaintiff designated Dr. Mark Nicas, an industrial hygienist, as her expert to establish Decedent's level of benzene exposure. Dr. Nicas calculated both an inhalation and dermal exposure for gasoline and Liquid Wrench. Inhalation exposure measures the amount of inhaled evaporated benzene, while dermal exposure measures the amount of benzene absorbed through the skin. Dr. Nicas calculated that Decedent had a total cumulative benzene exposure from gasoline and Liquid Wrench of 55 parts per million-years (ppm-years). A ppm-year is the calculation of a dose measurement used by industrial hygienists and health agencies that measures the amount of exposure to a product over a period of time. Epidemiology studies report statistically significant elevations AML at cumulative exposures to benzene of 45-200 ppm-years. In this case, the total 55 ppm-year figure was arrived at by adding Decedent's calculated inhaled exposure to benzene from gasoline and Liquid Wrench of 2.23 ppm-years, (1.92 ppm-years from gasoline; 0.30 ppm-years from Liquid Wrench) and his calculated dermal exposure to benzene from gasoline and Liquid Wrench of 52.75 ppm-years (45.3 ppm-years from gasoline and 7.45 ppm-years from Liquid Wrench).

**{17}**    The methodology Dr. Nicas used to calculate Decedent's inhaled exposure to benzene is not challenged. We therefore turn to the methodology used to calculate Decedent's dermal absorption of benzene. Dr. Nicas used three parameters to calculate the amount of benzene absorbed by Decedent through his skin: (1) the "flux rate" (or "flux parameter") of benzene, (2) the surface area of the skin exposed to benzene, and (3) the duration of the contact between the skin and benzene. The "flux rate" refers to the estimated rate at which a substance is absorbed through the skin into the bloodstream. Based upon deposition testimony that Decedent had "red and peely" skin rashes, that Decedent's hands were red and chapped from gasoline contact and working in the fields, and that he did not wear gloves when cleaning with gasoline, Dr. Nicas calculated that Decedent absorbed benzene at a rate five times greater (500%) than through healthy skin. The calculation then used the average area of an adult male's hands for the surface area of exposure. For the duration of the contact, Dr. Nicas relied on an affidavit of Decedent's son.

**{18}**    The district court excluded Dr. Nicas' opinion, concluding that the dermal absorption methodology he utilized was not scientifically valid or reliable. In arriving at its conclusion, the district court directed most of its criticism to the methodology Dr. Nicas used for calculating the flux rate of benzene through live human skin. For example, the district court found: (1) flux rates for benzene have no known error rate, reliability, or reproducibility; (2) there is no method for calculating the absorption rate of benzene as a constituent part of a solvent mixture such as gasoline and Liquid Wrench; (3) Dr. Nicas' reliance on a study to increase the benzene absorption rate by 500% is flawed; (4) the dermal absorption of benzene cannot reliably be combined with inhalation exposure to benzene for a total exposure estimate; and (5) the dermal flux model used by Dr. Nicas to calculate the amount of benzene that was absorbed by Decedent has not been tested, has not been validated or reproduced, and it is unreliable.

**{19}**    It is not necessary for us to determine whether the district court properly excluded Dr. Nicas' testimony pursuant to *Daubert-Alberico* on grounds that the methodology he used to calculate the flux rate of benzene through live, human skin is not scientifically valid and reliable. It is not necessary because a critical component of the analysis—the duration of the contact between Decedent's hands and gasoline—is unmistakably flawed and unreliable.

6

**{20}** In his report, describing the amount of time Decedent's hands were in gasoline, Dr. Nicas stated:

> To estimate benzene exposure assuming high usage of gasoline, I relied on the affidavit of Mr. Terry Andrews dated May 8, 2008. According to the affidavit, [Decedent]: (i) used rags soaked with gasoline to clean equipment for 10 minutes in the morning, six days a week; (ii) used rags soaked with gasoline to clean equipment for 10 minutes in the afternoon, two days a week; (iii) cleaned parts with a wire brush that were soaking in gasoline in a tray for 30 minutes once a week; and (iv) cleaned parts in the field for 15 minutes, three times a week, by pouring gasoline over the parts. According to the affidavit, [Decedent] did not wear gloves, and both hands were wet with gasoline during the entire time these tasks were performed. Therefore, I assumed the total time per week spent cleaning equipment with gasoline was 155 minutes (60 + 20 + 30 + 45 = 155 min), and that these cleaning tasks were done for 48 weeks per year. According to Mrs. Connie Andrews, the harvest "season" lasted eleven months (page 240, Connie Andrews deposition, December 11, 2007); this included months when the fields were being prepared for planting. I assumed that the entire skin surface of both hand[s] were wet with gasoline; Mr. Terry Andrews did not say that only parts of the hands were wet.

Thus, the Nicas calculation depends on both of Decedent's hands being immersed in gasoline slightly over 2.5 hours per week, 48 weeks per year, for approximately 24 years. This does not include Decedent's use of Liquid Wrench. Dr. Nicas calculated that in addition to the gasoline, Decedent's hands were in contact with Liquid Wrench one hour per week, 48 weeks per year, for approximately 24 years.

**{21}** In support of the motion to exclude Dr. Nicas' testimony, Defendants offered the affidavit of Dr. Irons. In his affidavit, supported by references to applicable literature and studies, Dr. Irons addressed whether a human being could tolerate soaking hands in gasoline for 2.5 hours per week over the period of time involved. He said that comparing Dr. Nicas' estimated dermal dose of benzene with that of other substances typically found in gasoline would result in a "reality check." The toluene, xylenes, and alkanes that are found in gasoline are present in concentrations "typically 50 times that of benzene." Moreover:

> The dermal flux of toluene through human skin has been determined to be 35-60 times faster than benzene, and that of xylene 11-23 times faster than benzene. Assuming that these and other solvents are present in gasoline at concentrations 50 fold higher than benzene, and applying the same assumptions and conditions made by Dr. Nicas, [Decedent] would absorb doses of toluene and xylenes alone that are approximately 700 to 1000 times greater during the same 2.5 hr period. Similar calculations can be made for other substituted benzenes and other solvents present in gasoline. Because the acute effects of all these compounds on the central nervous system are the same, the doses estimated for all of them are additive with respect to effect. Analysis of straight chain alkanes present at much higher concentrations would render much higher numbers and result, again, in acute central nervous system toxicity. These comparisons lead to the inevitable conclusion that the conditions and

7

assumptions made in the benzene dermal absorption estimates by Dr. Nicas are not consistent with repeated gasoline exposures that could be tolerated for 24 years of chronic exposure.

Finally, Dr. Irons stated that no reliable scientific or medical evidence suggested that these other materials found in gasoline are leukegenic or toxic to bone marrow.

{22} The foregoing evidence was undisputed, and Plaintiff made no effort to discredit or explain it. Moreover, Dr. Nicas admitted he did not look for or locate any articles related to the flux factor or dermal absorption of gasoline. While he may have seen a study in which the flux factor for gasoline was analyzed or evaluated, he could not remember, and he did not know how the flux factor for gasoline is measured. Dr. Nicas believes he has seen a study regarding the dermal absorption of gasoline. However, he said he did not have a copy of the study in his papers because he did not "believe it had information about the absorption of benzene." Concerning what the article reported was actually being absorbed by skin, Dr. Nicas could only say, "I don't remember the paper enough to tell you what was being absorbed."

{23} Dr. Nicas further admitted that in making his calculations, he focused exclusively on benzene and ignored the other toxic chemicals that are constituents of gasoline, although he conceded that xylene and toluene in gasoline could be dermally absorbed at higher rates or lower rates than benzene. Specifically, he does not know whether benzene or toluene would be absorbed through the skin faster than the other from a mixture in which they are both present. He also did not factor in whether alkanes that might be in gasoline would be dermally absorbed in the same manner and at the same rates as aromatics that might be in gasoline. In fact, when asked if alkanes are dermally absorbed if they are in gasoline, Dr. Nicas answered, "Some may be. I'm not really sure." In order to factor this variable into his calculations, he testified, "Someone would have to supply me the exact constituents of gasoline and the exact permeation rates of gasoline."

{24} Dr. Nicas also acknowledged he made no effort to see what the literature would disclose about the acute effects to skin that was immersed in gasoline for 155 minutes per week. When asked whether some constituents of gasoline cause skin to slough off with sufficient exposure, Dr. Nicas answered, "I don't know the exact effects of specific constituents of gasoline." Finally, when he was specifically asked whether a person can medically tolerate having their hands immersed in gasoline for 155 minutes per week and in Liquid Wrench for one hour per week for many years, Dr. Nicas said, "[I]t's a question I'm not prepared to answer, because that's not my area."

{25} After considering the foregoing evidence, the district court made the following findings of fact:

> [1.] Gasoline contains concentrations of "substituted benzenes," such as toluene and xylene, as well as alkanes which are typically 50 times the concentration of benzene in gasoline.

> [2.] Studies which have been conducted on relative flux for benzene and other chemicals have reported the dermal flux for toluene to be 30-60 times greater

8

than benzene and that of xylene 11-23 times greater than benzene, and Plaintiff has offered no evidence to the contrary.

[3.] Using the 50 fold greater than benzene typical concentrations of toluene, xylene and alkanes present in gasoline, and applying the same assumptions and conditions made by Dr. Nicas, [Decedent] would have absorbed doses of toluene and xylene alone at approximately 700 to 1000 times greater than his estimated benzene absorption, during the same [2.5] hour period, which absorption at such concentrations would have resulted in acute central nervous system toxicity that could not have been tolerated for 24 years of chronic exposure.

In accordance with these findings, the district court concluded as a matter of law that, "The methodology utilized by Dr. Nicas to arrive at his exposure estimates for [Decedent] is not scientifically valid, or reliable, and is excluded." Because Plaintiff relied exclusively on the opinion of Dr. Nicas to establish Decedent's exposure to benzene, the district court also concluded, "There is insufficient evidence of the levels of benzene and frequency of exposure by [Decedent] to gasoline and Liquid Wrench to support any claim that either one of these substances caused the disease that caused his death."

{26} The district court did not abuse its discretion in excluding the scientific testimony of Dr. Nicas. Dr. Nicas' calculation of Decedent's dermal absorption from gasoline required Decedent's hands to be immersed in gasoline for 2.5 hours per week, 48 weeks per year, for 24 years. The undisputed evidence is that such exposure would have resulted in Decedent's death from acute central nervous system toxicity due to the dermal absorption of other toxic constituents of gasoline that are absorbed much faster (700 to 1000 times) than benzene in gasoline. *See In re TMI Litigation*, 193 F.3d 613, 683, 687-88 (3d Cir. 1999) (concluding that the experts' estimates of radiation exposure were not reliable because they would have resulted in the death of half of the region's population, which did not occur); *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 788 (S.D.Tex. 2000) (noting that the expert's report calculating the decedent's exposure to benzene from gasoline would have required the decedent to be exposed to gasoline in potentially lethal amounts); *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984) (noting that generally, expert testimony should be excluded if it is based on assumptions that "were so unrealistic and contradictory as to suggest bad faith").

{27} Scientific evidence offered by a party is reviewed by our trial courts pursuant to the factors set forth in *Daubert/Alberico* to insure that the evidence is reliable. Thus, the reliability determination itself is the overarching issue we review for an abuse of discretion. The calculations in this case were shown without contradiction to be unreliable because they were based on assumptions which would have resulted in Decedent's demise from causes other than dermal absorption of benzene from gasoline. The order of the district court excluding the opinions of Dr. Nicas on this basis is affirmed. It is not necessary for us to analyze the additional reasons given by the district court for excluding Dr. Nicas' opinions.

**E.     Opinion of Dr. Frank Gardner**

**{28}** Plaintiff offered the testimony of Dr. Frank Gardner, a hematologist, to testify that Plaintiff's form of MDS was caused by his exposure to benzene. The evidence before the district court is that refractory anemia with ringed sideroblasts (RARS) and refractory anemia with excess blasts (RAEB) are subtypes of myelodysplastic syndrome (MDS). Dr. Gardner concluded that Decedent had RAEB.

**{29}** Defendants' experts criticized Dr. Gardner's methodology for concluding that Decedent had RAEB. Moreover, they concluded that Decedent had RARS, and Benzene does not cause RARS. On these grounds, Defendants contended, and the district court agreed, that Dr. Gardner's opinions should be excluded.

**{30}** It is not necessary for us to undertake an analysis of whether the district court abused its discretion by excluding Dr. Gardner's scientific testimony. Dr. Gardner testified that he does not know what the threshold of exposure to benzene is to connect with a myelodysplasia, and he reached no quantitative conclusions about the level of benzene exposure Decedent may have had. He relied exclusively on the conclusions of Dr. Nicas about Decedent's level of exposure to Benzene. Without evidence that Decedent was exposed to sufficient quantities of Benzene to cause MDS, Dr. Gardner's opinions were not relevant. For this reason, we therefore conclude that the district court did not abuse its discretion in excluding Dr. Gardner's testimony.

## II.     Expert Witness Fees and Cost Bill

**{31}** After the district court granted summary judgment, Defendants filed a cost bill, to which Plaintiff duly objected. Following a hearing, the district court entered its order awarding Defendants' costs, and Plaintiff appeals from this order as well.

**{32}** Rule 1-054(D) NMRA governs an award of costs in the district court. Whether the district court properly interprets Rule 1-054(D) in making its award presents a question of law, which we review de novo. *H-B-S P'ship v. Aircoa Hospitality Servs., Inc.*, 2008-NMCA-013, ¶ 5, 143 N.M. 404, 176 P.3d 1136. On the other hand, the necessary and reasonable costs awarded by the district court are reviewed for an abuse of discretion. *Id.* ¶ 24.

**{33}** Rule 1-054(D) directs that costs (other than attorney fees) "shall be allowed to the prevailing party unless the court otherwise directs," and that costs are recoverable "as allowed by statute, Supreme Court rule and case law." Rule 1-054(D)(1), (2). In pertinent part, the rule directs that the cost of a deposition is generally recoverable:

>      (i)      if any part is used at trial; [or]

>      (ii)      in successful support or defense of a motion for summary judgment pursuant to Rule 1-056 NMRA; *or*

>      (iii)      *when the court determines the deposition was reasonably necessary to the litigation*[.]

Rule 1-054(D)(2)(e) (emphasis added). In addition, "expert witness fees for services as provided by Section 38-6-4(B) NMSA 1978 *or when the court determines that the expert witness was reasonably necessary to the litigation*" are also generally recoverable. Rule 1-054(D)(2)(g) (emphasis added). The language in the rule we have emphasized above was added by our Supreme Court, effective May 23, 2008. Supreme Court Order No. 08-8300-011. The amendments apply even though the complaint was filed before they came into effect. *State v. Pieri*, 2009-NMSC-019, ¶ 35, 146 N.M. 155, 207 P.3d 1132 (stating that when the Supreme Court changes its own rules, the changes apply to pending cases in the absence of some affirmative act by the Supreme Court). NMSA 1978, Section 38-6-4(B) (1983) provides that the district court

> may order the payment of a reasonable fee, to be taxed as costs, . . . for any witness who qualifies as an expert and who testifies in the cause in person or by deposition. The additional compensation shall include a reasonable fee to compensate the witness for the time required in preparation or investigation prior to the giving of the witness's testimony. The expert witness fee which may be allowed by the court shall be limited to one expert regarding liability and one expert regarding damages unless the court finds that additional expert testimony was reasonably necessary to the prevailing party and the expert testimony was not cumulative.

**{34}** The district court awarded Defendants expert witness fees for Dr. Ethan A. Natelson, Mr. John W. Spencer, and Dr. Irons, as well as the cost of the deposition for Dr. Irons. Plaintiff contends the award of these costs was improper under Rule 1-054(D). We conclude that the award falls within the ambit of Rule 1-054(D) and that the district court did not abuse its discretion in awarding these costs.

**{35}** Dr. Natelson is a practicing hematologist oncologist and is certified by the American Board of Medical Specialties in internal medicine and hematology. He provided an affidavit, supported by references to applicable literature and studies, criticizing the methodology Dr. Gardner followed in formulating his opinions. The affidavit was used by Defendants to support their memorandum seeking summary judgment; by Plaintiff to support her memorandum in opposition to Defendants' motion for summary judgment and her response to exclude the testimony of Dr. Gardner; and by Defendants in their reply in support of the motion for summary judgment and the motion to exclude the testimony of Dr. Gardner. Finally, Dr. Natelson appeared and testified on behalf of Defendants at the *Daubert/Alberico* hearing, where Plaintiff was given an opportunity to cross examine him.

**{36}** Mr. Spencer has been an industrial hygienist for more than thirty-one years, and he is certified as an industrial hygienist by the American Board of Industrial Hygiene. He was formerly with the National Institute for Occupational Safety and Health (NIOSH) and led a group of industrial hygienists conducting research for the National Occupational Exposure Survey. As an industrial hygienist for the United States Coast Guard, he conducted thousands of exposure assessments which included a wide range of products, including various benzene-containing solvents. Mr. Spencer provided an affidavit, which was also supported by references to applicable literature and studies, criticizing the methodology used by Dr. Nicas to calculate Decedent's exposure to benzene from gasoline and Liquid Wrench. The affidavit was used by Defendants in support of the motion to exclude the testimony of Dr. Nicas, and Mr. Spencer also provided live testimony in support of the motion at the *Daubert/Alberico* hearing, where Plaintiff was able to cross examine him.

11

**{37}**     Dr. Irons is a toxicologist with an extensive background in hematology.  He also provided an affidavit supported by references to applicable literature and studies, criticizing the methodology used by Dr. Gardner and Dr. Nicas in formulating their respective opinions.  Dr. Iron's affidavit was used by Defendants to support the motion to exclude the testimony of Dr. Gardner and in their memorandum in support of the motion for summary judgment.  Moreover, Dr. Irons was deposed, and portions of his deposition were used by Defendants in the reply in support of the motion for summary judgment and to exclude the testimony of Dr. Nicas.

**{38}**     The testimony given by these experts, whether by affidavit or by deposition, was material to the award of summary judgment granted by the district court in favor of Defendants.  We have only addressed one basis on which the testimony of Dr. Nicas and Dr. Gardner was excluded.  Nevertheless, the district court excluded the testimony of Plaintiff's experts on several grounds pursuant to *Daubert/Alberico*, and the findings of fact and conclusions of law the district court reflect that the testimony of each expert was used in granting the motion.

**{39}**     Moreover, the district court demonstrated it exercised its discretion consistent with Rule 1-054(D)(2).  At the conclusion of the hearing on Plaintiff's objections to Defendants' cost bill, the district court commented, "I think that in today's practice, a *Daubert* hearing is the functional equivalent of a motion for summary judgment."  In its order awarding costs, the district court made a finding that "[t]he procedural effect and reality is . . . Defendant's *Daubert* Motion was the basis for Defendant's Motion for Summary Judgment and became a part thereof."  We agree.  In addition, the district court made specific findings that the testimony at the *Daubert/Alberico* hearing consisted of both the live testimony and the affidavit and deposition testimony of the experts; that the testimony of the experts was not cumulative; and that the testimony of each expert was reasonably necessary to Defendants' success as the prevailing party.  These findings are not challenged.  We find no abuse of discretion. *See Gillingham v. Reliable Chevrolet*, 1998-NMCA-143, ¶¶ 26-27, 126 N.M. 30, 966 P.2d 197 (concluding that consulting fees paid to physicians who qualified as experts and testified at trial and consulting fees paid to two treating physicians listed as potential expert witnesses by opposing party were properly taxed as costs; and noting that a separate finding as to the reasonable necessity of each expert's testimony is not required), *overruled on other grounds by Fernandez v. Espanola Pub. Sch. Dist.*, 2005-NMSC-026, ¶ 9, 138 N.M. 283, 119 P.3d 163.

**CONCLUSION**

**{40}**     The district court is affirmed.

**{41}     IT IS SO ORDERED.**

 

_____
**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____

**LINDA M. VANZI, Judge**

**Topic Index for** *Andrews v. U.S. Steel Corp.***, Docket Nos. 29,136/29,336**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-EX | Expert Witnesses |
| CP-SJ | Summary Judgment |
| | |
| **EV** | **EVIDENCE** |
| EV-EW | Expert Witness |
| EV-SC | Scientific Evidence & Daubert Standard |
| | |
| **TR** | **TORTS** |
| TR-TX | Toxic Tort |
| TR-WD | Wrongful Death |