1999-NMSC-040

992 P.2d 860

**PUBLIC SERVICE COMPANY OF NEW MEXICO, Appellant,**

v.

**NEW MEXICO PUBLIC UTILITY COMMISSION, City of Gallup, Gallup Joint Utilities, and Pittsburg & Midway Coal Mining Co., Appellees.**

No. 25,386.

Supreme Court of New Mexico.

Oct. 13, 1999.

Rehearing Denied Nov. 23, 1999.

Sarah D. Smith, Albuquerque, Keleher & McLeod, P.A., Richard B. Cole; Patrick V. Apodaca, Claudia Gayheart Crawford, Albuquerque, for Appellant.

Stacey J. Goodwin, Santa Fe, Miller, Stratvert & Torgerson, P.A., Alan Konrad, Marte Lightstone, Albuquerque, Margot J. Steadman, Corrales, for Appellees.

## OPINION

MINZNER, Chief Justice.

{1} The Public Service Company of New Mexico (PNM) appeals an order of the New Mexico Public Utility Commission [1] directing the wheeling of electric power. We need consider only one of the issues raised by

---

1. In the case at bar, all regulatory action was initially taken in the name of the Public Utility Commission (PUC). *See* NMSA 1978, § 62–3–3(B) (1996). Effective January 1, 1999, however, the PUC was subsumed within the newly organized Public Regulation Commission (PRC). *See* NMSA 1978, § 62–3–3(B) (1998). In this Opinion we refer only to the "Commission."

PNM on appeal: whether the City of Gallup and Gallup Joint Utilities (collectively "Gallup") as well as the Pittsburg & Midway Coal Mining Co. lack the authority under the New Mexico Public Utilities Act (NMPUA), NMSA 1978, §§ 62–1–1 to 62–6–26.1, 62–8–1 to 62–13–15 (1941, as amended through 1997, prior to 1998 amendment),[2] to seek a wheeling order from the Commission. We conclude this issue is dispositive and that the Commission lacked statutory authority to enter the order it issued, because the City of Gallup is not an "interested electric utility" under Section 62–6–25(B). Therefore, we vacate the Commission's order.

## I.

{2}   PNM provides retail electric power to the McKinley Mine, a strip coal mine owned by Pittsburg & Midway and located about fifteen miles northwest of Gallup. On March 25, 1975, PNM and Pittsburg & Midway entered into a facilities agreement whereby PNM agreed to build, own, and operate an electric transmission line and other facilities necessary for the delivery of electric power to the mine. Pursuant to the 1975 agreement, PNM built the Y–P line, which extended 10.4 miles from PNM's Yah–Ta–Hey switching substation to the mine. Pittsburg & Midway agreed to pay for power and energy costs, including a monthly minimum demand, as determined by PNM's 5B Industrial Power Service Tariff. Pittsburg & Midway also agreed to pay a monthly rental fee of 1.5% of the total installed cost of the Y–P line and support facilities.

{3}   The 1975 agreement accorded Pittsburg & Midway an option to purchase the Y–P line. Pittsburg & Midway exercised this option and the parties agreed to a price and other terms of purchase. Pursuant to the purchase terms, PNM was obligated to satisfy all the regulatory requirements imposed upon the sale by the Commission and the Federal Energy Regulatory Commission (FERC). From the record, it is not clear whether the 1975 agreement contemplated that PNM would wheel power on behalf of

another power provider in the event Pittsburg & Midway sought to purchase electric power from another power provider; however, in the Y–P–line sales agreement, PNM agreed to address wheeling issues and to secure interconnection agreements.

{4}   On January 7, 1998, Pittsburg & Midway and Gallup entered into an "Agreement in Principle," under which Pittsburg & Midway would sell the Y–P line to Gallup after it acquired the line from PNM. Pittsburg & Midway also agreed that after the transfer of the Y–P line, it would purchase from Gallup all the power it needed for the McKinley Mine. For its part, Gallup agreed to purchase the mine's full power requirements from the Arizona Public Service Company (APS), an Arizona public utility. From the record, it appears that Pittsburg & Midway and Gallup intended that PNM would wheel APS power to PNM's Yah–Ta–Hey substation.

{5}   Like Pittsburg & Midway, Gallup is a PNM customer. Under the terms of a 1992 agreement, PNM provides Gallup electric power at four points of delivery; the agreement contemplates that other points of delivery may be established upon mutual consent. At no time have PNM and Gallup agreed that the Yah–Ta–Hey substation would be a delivery point under the 1992 agreement.

{6}   On January 7, 1998—the same day that Pittsburg & Midway and Gallup entered into their Agreement in Principle—Pittsburg & Midway and Gallup filed with the Commission a Joint Complaint and Petition for Declaratory Order Regarding Service Statutes and Abandonment of Facilities. The Joint Complaint alleged that PNM had failed to fulfill its obligations under both the 1975 agreement and the Y–P–line sales contract and that PNM had obstructed Pittsburg & Midway's efforts to secure power from suppliers that provided electric power at lower prices. The Joint Complaint also alleged that PNM had prevented Gallup from providing electric power to Pittsburg & Midway. The Joint Complaint contained several prayers for relief, including a request for a de-

---

**2.**  Unless otherwise indicated, this Opinion does not consider the effect, if any, of the 1998 amendments to the NMPUA, because for the

most part, these amendments do not take effect until July 1, 2003. *See* 1998 N.M.Laws ch. 108, § 82.

claratory order finding, among other things, that Pittsburg & Midway was not obligated to purchase electric power from PNM according to its 5B Industrial Power Service Tariff, that Gallup was entitled to provide Pittsburg & Midway with electric power, that PNM should be required to wheel Gallup-purchased power over PNM's transmission system to the McKinley Mine, and that PNM should be required to enter into an agreement with Gallup regarding an interconnection of the Yah–Ta–Hey substation. The Commission ordered the parties to brief the question whether the Joint Complaint stated a cause of action within the Commission's jurisdiction.

{7} Without holding a full evidentiary hearing, the Commission issued a Final Order on September 11, 1998. Among other things, this order required PNM to wheel power on behalf of Gallup. The order also required PNM to deliver the power to Gallup at the Yah–Ta–Hey substation as a new point of delivery and to complete the sale of the Y–P transmission line to Pittsburg & Midway. On September 22, 1998, PNM filed a Notice of Appeal as well as a Motion for Emergency Stay of Order Pending Appeal. This Court denied the motion for stay, but we remanded the cause to the Commission to consider the matters raised in that motion.

{8} On November 30, 1998, after a full evidentiary hearing, the Commission considered the remanded cause and issued a Final Order on Remand. This order required PNM to negotiate and execute a contract with Pittsburg & Midway for the sale of the Y–P line and to wheel power to Gallup at the Yah–Ta–Hey substation according to the 1992 agreement between Gallup and PNM and the terms of FERC Order 888.[3] The Commission conditioned the wheeling requirement upon its consistency with Part II of the Federal Power Act (FPA), 49 Stat. 838 (1935) (codified as amended in scattered sections of 16 U.S.C. § 791a–825r), as well as with FERC regulations, opinions, and tariff provisions.

{9} On September 25, 1998, before the Commission considered the remanded cause, PNM filed with FERC a petition for a declaratory order. *See Public Serv. Co.*, 87 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,-032, at 61,108 (1999). In its petition, PNM asked FERC to declare that both the FPA and FERC orders preempt the September 11, 1998 order of the Commission. *See id.* On November 16, 1998, Gallup filed a late motion to intervene in FERC's action on the petition, and FERC ultimately accepted Gallup's motion. *See id.* at 61,108, 61,113. On December 28, 1998, after the Commission issued its Final Order on Remand, PNM filed an application with FERC seeking an order authorizing the sale of the Y–P line to Pittsburg & Midway. *See id.* at 61,108. On January 26, 1999, Gallup and Pittsburg & Midway filed a joint motion to intervene in FERC's action on PNM's application. *See id.*

{10} On April 5, 1999, FERC issued an order. *See id.* at 61,108. In the order, FERC "conclude[d] that [PNM] ... demonstrated that the sale of the Y–P Line is consistent with the public interest," *id.* at 61,113, and conditionally approved the sale. *See id.* at 61,114. FERC refrained from addressing PNM's preemption arguments "in light of [FERC's] decision ... to set for hearing ... the issue of whether the [1992] [PNM]–Gallup Agreement ... already requires [PNM] to transmit third-party power to Gallup at the Yah–Ta–Hey Substation." *Id.* at 61,110. Specifically, FERC "[found] that the language of the ... Agreement [was] ambiguous" and "believe[d] it appropriate to set this contract interpretation dispute ... for a trial-type evidentiary hearing before an administrative law judge." *Id.* at 61,111. It was so ordered. *See id.* at 61,-113–14. The record does not contain the final disposition of the administrative law judge.

{11} On December 15, 1998—fifteen days after the Commission issued its Final Order

---

**3.** Among other things, FERC Order 888 required that "all public utilities that own, control or operate facilities used for transmitting electric energy in interstate commerce [must] have on file open access non-discriminatory transmission

tariffs." 61 Fed.Reg. 21,540 (May 10, 1996); *see also* 18 C.F.R. § 35.28(c) (1999) (discussing "non-discriminatory open access transmission tariffs").

on Remand—PNM filed a Supplemental Notice of Appeal in this Court, which has jurisdiction over direct appeals from the Commission. *See* § 62–11–1. In its motion, PNM asked this Court to consolidate its appeal from the Final Order on Remand in its prior appeal. In this Opinion, we review only the Commission's Final Order on Remand. The prior Order was vacated earlier.

{12} In general, we "shall vacate and annul the order complained of if it is made to appear to the satisfaction of the [C]ourt that the order is unreasonable or unlawful." Section 62–11–5. As the party appealing from the Commission's order, PNM has "the burden . . . to show that the order appealed from is unreasonable, or unlawful." Section 62–11–4. This Court has previously explained the "unreasonable or unlawful" standard of review as follows:

On appeal, this Court determines whether the Commission's "order is supported by substantial evidence, is neither arbitrary nor capricious, and is within the Commission's scope of authority." *El Vadito de los Cerrillos Water Ass'n v. New Mexico Pub. Serv. Comm'n,* 115 N.M. 784, 787, 858 P.2d 1263, 1266 (1993); *accord Attorney Gen. v. New Mexico Pub. Serv. Comm'n,* 101 N.M. 549, 553, 685 P.2d 957, 961 (1984). . . . [W]e defer to "Commission decisions requiring expertise in highly technical areas, such as utility rate determinations," however, we grant less deference "when reviewing determinations outside the realm of the Commission's expertise." *El Vadito,* 115 N.M. at 787, 858 P.2d at 1266.

*Plains Elec. Generation & Transmission Coop., Inc. v. New Mexico Pub. Util. Comm'n (In re Order to Show Cause),* 1998–NMSC–038, ¶ 7, 126 N.M. 152, 967 P.2d 827. For the following reasons, we conclude that the Commission's Order exceeds its authority.

## II.

■ {13} PNM raises several points of error in its appeal of the Commission's Final Order on Remand. We determine, however, that we need only address one: PNM's contention that neither Gallup nor Pittsburg &

Midway is authorized to seek a wheeling order from the Commission under Section 62–6–25(B). The Commission held that Gallup was authorized to seek such an order. We are not persuaded that the Commission correctly construed the statutory scheme. Further, properly construed, the statutory scheme restricts the Commission's power to order wheeling. In this case, the Commission exceeded its authority.

■ {14} "Interpretation of a statute is an issue of law, not a question of fact. We review questions of law de novo." *State v. Rowell,* 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995) (citations omitted). Because statutory construction is "outside the realm of the Commission's expertise," *El Vadito,* 115 N.M. at 787, 858 P.2d at 1266, we afford little, if any, deference to the Commission on this matter. Upon de novo review, we conclude that Section 62–6–25(B) did not authorize Gallup to seek a wheeling order from the Commission.

{15} Section 62–6–25(B) provides, in pertinent part, that "upon complaint of an *interested electric utility* or *rural electric cooperative,* . . . the [C]ommission may . . . require another electric utility to provide transmission services to the complainant ." (Emphasis added). PNM asserts that neither Gallup nor Pittsburg & Midway qualify as an "interested electric utility" or a "rural electric cooperative." For their part, Gallup and Pittsburg & Midway do not argue before this Court that either of them qualifies as a "rural electric cooperative"; neither do they argue that Pittsburg & Midway qualifies as an "interested electric utility." Similarly, the record suggests that Gallup and Pittsburg & Midway argued before the Commission that only Gallup qualified as an "electric utility." In light of the arguments made before the Commission and on this appeal, we limit our discussion to the question whether the Commission correctly determined that Gallup was an "interested electric utility" under Section 62–6–25(B).

{16} We note at the outset that no provision of the NMPUA defines the terms "electric utility" and "interested electric utility." We also note that no published New Mexico

case has ever construed the term "interested electric utility."

{17} PNM seeks meaning for the term "interested electric utility" in the definition of "utility" set forth in Section 62–3–3(G). This section begins: " '[P]ublic utility' or 'utility' means every *person* not engaged solely in interstate business...." (Emphasis added). Section 62–3–3(E) defines the term "person." PNM correctly points out that the definition of "person" in Section 62–3–3(E) expressly excludes "a municipality ... unless the municipality has elected to come within the terms of the [NM]PUA." PNM argues that because Gallup has not voluntarily elected to come within the terms of the NMPUA, Gallup fails to qualify as a "person"—and therefore a "utility" *and* an "interested electric utility"—under the act. We agree.

{18} "In construing a particular statute, a reviewing court's central concern is to determine and give effect to the intent of the legislature." *State ex rel. Klineline v. Blackhurst,* 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988). We recently observed the following canons of statutory construction, which aid in ascertaining legislative intent:

> [T]he "plain language of a statute is the primary indicator of legislative intent." *General Motors Acceptance Corp. v. Anaya,* 103 N.M. 72, 76, 703 P.2d 169, 173 (1985). Courts are to "give the words used in the statute their ordinary meaning unless the legislature indicates a different intent." [*Blackhurst,* 106 N.M. at 735, 749 P.2d at 1114]. The court "will not read into a statute or ordinance language which is not there, particularly if it makes sense as written." [*Burroughs v. Board of County Comm'rs,* 88 N.M. 303, 306, 540 P.2d 233, 236 (1975) ].

*High Ridge Hinkle Joint Venture v. City of Albuquerque,* 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599. Relying upon these canons of construction, we conclude that Gallup is not an "interested electric utility" under Section 62–6–25(B).

{19} Section 62–6–25(B) employs the term "utility," which is defined in Section 62–3–3(G). Likewise, Section 62–3–3(G) employs the term "person," which is defined in Section 62–3–3(E). It therefore follows that

the issue whether Gallup qualifies as an "interested electric utility" turns on the construction of the term "person," as defined in Section 62–3–3(E). *See* NMSA 1978, § 12–2A–2 (1997) ("Unless a word or phrase is defined in the statute or rule being construed, its meaning is determined by its context, the rules of grammar and common usage.").

{20} The Legislature has phrased Section 62–3–3(E) in very plain language: "In the absence of [such] voluntary election by any municipality to come within the provisions of the [NMPUA], the municipality shall be expressly excluded from the operation of that act and ... *all of its provisions,* and no such municipality shall *for any purpose* be considered a public utility." (Emphases added). In *Morningstar Water Users Ass'n v. New Mexico Pub. Util. Comm'n,* we noted:

> The [NM]PUA definitional statute, Section 62–3–3(E), could not be more explicit: "[N]o such municipality shall *for any purpose* be considered a public utility." (Emphasis added). The exclusion of municipalities is reemphasized by other statutes in the [NM]PUA.
>
> The definitional statute sets the basic parameters for everything else in the NM[PUA]. Once something is defined out of a statute it cannot, without an unambiguous and specific provision, be brought back in.

120 N.M. 579, 588–89, 904 P.2d 28, 37–38 (1995) (citation omitted). Although *Morningstar* addressed the specific issue of whether the Commission had jurisdiction over a municipal water facility, *see id., Morningstar*'s construction of Section 62–3–3(E) also controls this case. *See also United Water New Mexico, Inc. v. New Mexico Pub. Util. Comm'n,* 121 N.M. 272, 277, 910 P.2d 906, 911 (1996) ("[T]he legislature ... [has] made it very clear that municipalities are excluded from the definition of public utilities under the [NMPUA]." (citing Section 62–3–3(E)); *Southern Union Gas Co. v. New Mexico Pub. Serv. Comm'n,* 82 N.M. 405, 406–07, 482 P.2d 913, 914–15 (1971) (holding that because the United States was not a "person" as defined in the NMPUA, it did not have

standing to intervene in the judicial review of a Commission order), *overruled on other grounds by De Vargas Sav. & Loan Ass'n v. Campbell*, 87 N.M. 469, 535 P.2d 1320 (1975). Under this construction, Gallup most definitely does not qualify as "person," and thus is neither a "utility" *nor* an "interested electric utility."

{21} Both the Commission and Gallup concede that Gallup has not elected to come within the NMPUA's regulatory scheme. Nevertheless, for several reasons, they reject PNM's "hyper-technical construction of portions of the [NMPUA]." First, the Commission notes that the express policy underlying Section 62–6–25(B) is "[t]o ensure efficient and reliable operation of New Mexico power grids." In view of this policy, the Commission argues that municipalities should be authorized to seek wheeling orders under Section 62–6–25(B). We are unpersuaded, however, that the express policy should be read so broadly as to offend the plain language of Section 62–3–3(E), which clearly circumscribes the policy announced in Section 62–6–25(B).

{22} Second, the Commission and Gallup contend that because the term "electric utility" is not defined in the NMPUA, or anywhere else in the New Mexico Statutes Annotated, this Court should provide meaning to that term by reading the NMPUA in pari materia with other statutory provisions, including the Municipal Code, NMSA 1978, §§ 3–1–1 to 3–64–5 (1965, as amended through 1998). *See, e.g.*, § 3–1–2(R) (defining the term "joint participant" under the Municipal Code); §§ 3–24–1 to 3–24–18 (providing for the regulation of municipally owned electric utilities); *see also State ex rel. Sandel v. New Mexico Pub. Util. Comm'n*, 1999–NMSC–019, ¶ 13, 127 N.M. 272, 980 P.2d 55 ("The nature and extent of the [Commission's] authority was defined by the Legislature when it enacted and amended the NMPUA. To determine the intended scope of the [Commission's] authority, the NMPUA must be read as a whole, and harmonized with other statutes concerning the same subject matter." (citations omitted)). We disagree.

{23} This Court has previously explained how it reads in pari materia different statutes that cover the same subject matter:

In ascertaining legislative intent, the provisions of a statute must be read together with other statutes in pari materia under the presumption that the legislature acted with full knowledge of relevant statutory and common law.... Thus, two statutes covering the same subject matter should be harmonized and construed together *when possible*, in a way that facilitates their operation and the achievement of their goals.

*State ex rel. Quintana v. Schnedar*, 115 N.M. 573, 575–76, 855 P.2d 562, 564–65 (1993) (emphasis added) (citations omitted). In light of the plainly exclusive language of Section 62–3–3(E), however, it is not possible to read Section 62–6–25(B) in harmony with less exclusive statutory schemes.

{24} Finally, Gallup argues that Section 62–3–3(E) does not control Section 62–6–25(B), because the latter is more specific than the former, *see Lopez v. Barreras*, 77 N.M. 52, 54, 419 P.2d 251, 253 (1966) ("Conflicts between general and specific statutes are resolved by giving effect to the specific statute."), and because the latter was enacted later in time, *see* NMSA 1978, § 12–2A–10 (1997) ("If statutes appear to conflict, they must be construed, if possible, to give effect to each. If the conflict is irreconcilable, the later-enacted statute governs."). We determine that both the rule of specificity and the rule of time are inapposite in this case, because there is no conflict between Section 62–3–3(E) and Section 62–6–26(B). Quite to the contrary, as a definitional provision, Section 62–3–3(E) actually informs the meaning of Section 62–6–25(B).

{25} We also note that in spite of numerous statutory amendments, the language in Section 62–3–3(E) has remained virtually intact since the promulgation of the NMPUA in 1941. *Compare* NMSA 1978, § 62–3–3(E) (1998), *with* NMSA 1941, § 72–302(d) (1941). Hence, it appears that the Legislature has continuously contemplated that the exclusive definition of the term "person" should control the meaning of "interested electric utility" insofar as the latter phrase describes which

entities are authorized to seek wheeling orders from the Commission under Section 62–6–25(B). *See Southern Union Gas Co.,* 82 N.M. at 407, 482 P.2d at 915 ("[The NMPUA section defining the term 'person'] has been reenacted three times [between 1941 and 1967] ..., and each re-enactment has resulted in a definition identical to the original. Thus, the legislature has had three opportunities to change definitional language and expand it, if it cared to do so."); *see also Schnedar,* 115 N.M. at 575, 855 P.2d at 564 ("We ... presume that the legislature did not intend to enact a law inconsistent with existing law. This rule of statutory construction complements the notion that judicial repeal of legislation by implication is disfavored." (citation omitted)); *Quintana v. New Mexico Dep't of Corrections,* 100 N.M. 224, 227, 668 P.2d 1101, 1104 (1983) ("When interpreting a statute we presume that the Legislature was informed as to existing law, and that the Legislature did not intend to enact a law inconsistent with any existing law.").

{26}   For these reasons, we conclude that Gallup has been "defined out" of Section 62–6–25(B) and that it has not been "brought back in" with "an unambiguous and specific provision." *Morningstar,* 120 N.M. at 589, 904 P.2d at 38. Thus, while we agree with Gallup that "[t]he phrase 'electric utility' is pretty plain," we do not agree that "Gallup is pretty plainly an electric utility," as that term is used in Section 62–6–25(B). We therefore conclude that Gallup does not qualify as an "interested electric utility" authorized to seek a wheeling order from the Commission under that section. We also conclude that as a consequence the Commission lacked statutory authority to order wheeling under Section 62–6–25(B). *See Sandel,* 1999–NMSC–019, ¶ 28, 127 N.M. 272, 980 P.2d at 64 (holding that "the NMPUC has exceeded its [statutory] authority in violation of Article III, Section I of the New Mexico Constitution."); *In the Matter of Jacinta M.,* 107 N.M. 769, 771, 764 P.2d 1327, 1329 (Ct.App.1988) (holding the children's court exceeded its statutory authority by "prohibit[ing] the Department [of Human Services] from placing physical custody of the child with any particular person.").

## III.

{27}   Section 62–6–25(B) of the NMPUA did not authorize Gallup to seek a wheeling order from the Commission. The Commission has not identified any other statutory authority for the Order it entered. We conclude the Commission's Final Order on Remand is unlawful and we annul and vacate the Order.

{28}   **IT IS SO ORDERED.**

BACA, FRANCHINI, SERNA and MAES, JJ., concur.

