**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number:  2018-NMCA-024**

**Filing Date:  December 27, 2017**

**Docket No. A-1-CA-35253**

**COMMUNITIES FOR CLEAN WATER,**

>   **Appellant,**

**v.**

**NEW MEXICO WATER QUALITY
CONTROL COMMISSION,**

>   **Appellee,**

**and**

**NEW MEXICO ENVIRONMENT
DEPARTMENT and LOS ALAMOS
NATIONAL SECURITY, LLC.,**

>   **Intervenors.**

**ADMINISTRATIVE APPEAL FROM THE NEW MEXICO WATER QUALITY
CONTROL COMMISSION**
**Jeffrey N. Holappa, Hearing Officer**

New Mexico Environmental Law Center
Jaimie Park
Jonathan Block
Eric Jantz
Douglas Meiklejohn
Santa Fe, NM

for Appellant

New Mexico Water Quality Control Commission
Special Assistant Attorney General
Christopher Atencio, Assistant General Counsel
Albuquerque, NM

1

for Appellee

New Mexico Environment Department
Special Assistant Attorney General
John Verheul, Assistant General Counsel
Albuquerque, NM

for Intervenor N.M. Environment Department

Montgomery & Andrews, P.A.
Louis W. Rose
Kari E. Olson
Santa Fe, NM

Office of Laboratory Counsel
Los Alamos National Laboratory
Timothy A. Dolan

for Intervenor Los Alamos National Security, LLC

**OPINION**

**VARGAS, Judge.**

**{1}** Communities for Clean Water (CCW) describes itself as a growing network of organizations whose mission is to ensure that "community waters which receive adverse impacts from [Los Alamos National Labs], its current operations and its legacy waste, are kept safe for drinking, agriculture, sacred ceremonies, and a sustainable future." CCW appeals from the final order of the Water Quality Control Commission (WQCC) sustaining the decision of the New Mexico Environment Department (NMED) to deny CCW's request for a public hearing on the water discharge permit application of the United States Department of Energy (DOE) and Los Alamos National Security, LLC (LANS) (collectively, DOE/LANS). Specifically, the parties disagree as to whether NMED has discretion to deny its request for a public hearing, and if so, whether CCW established a substantial public interest in the permit application, mandating a public hearing under the Water Quality Act (the Act), NMSA 1978, §§ 74-6-1 to -17 (1967, as amended through 2013), and its corresponding regulations. We hold that while NMED has limited discretion to grant or deny a public hearing, the WQCC lacked substantial evidence to support its decision to sustain NMED's denial of CCW's request for a public hearing. We reverse.

**BACKGROUND**

**{2}** In December 2011, DOE/LANS applied for a discharge permit with the Ground Water Quality Bureau (Bureau) of NMED. Following an amendment in January 2014, the

2

application became "administratively complete" under 20.6.2.3108 NMAC in December 2014. NMED issued a draft permit and proposed approval on January 22, 2015. In response to the proposed approval, DOE/LANS submitted comments on the draft permit and requested a hearing, expressing a hope that any concerns could be "resolved in advance of a public hearing" in which case it intended to "immediately withdraw the hearing request."

{3} CCW submitted its comments and requested a public hearing on March 2, 2015. On April 15, 2015, CCW, NMED, and DOE/LANS met to discuss the permit, after which CCW again requested a public hearing and submitted further comments.

{4} In May 2015, the Bureau issued a final draft of the permit. DOE/LANS submitted additional comments on the final draft. In response to the final draft of the permit, CCW again submitted substantive comments to the Bureau and submitted its third request for a public hearing in June 2015.

{5} Upon receipt of CCW's third request, the Bureau sent a memorandum to its Water Protection Division on July 8, 2015, recommending that CCW's requests for a public hearing be denied. The next day, DOE/LANS withdrew its request for public hearing. Two weeks later, NMED informed CCW by letter dated July 24, 2015, that its request for a hearing was denied. NMED explained that the secretary of NMED (secretary) had denied the request for a public hearing because the permit, as drafted, already contemplated community involvement and was in the public interest, stating:

> It is the opinion of the Department that NMED has drafted a Discharge Permit that provides transparency and opportunity for community involvement at an unprecedented level. The proposed activity by LANL is intended to address historic impacts to groundwater and protect water resources and communities, and issuance of this Discharge Permit is in the public interest.

Three weeks later, on July 27, 2015, NMED issued the permit.

{6} CCW appealed the denial of its public hearing request and approval of the permit to the WQCC. Following a hearing on CCW's appeal, the WQCC sustained NMED's decision to deny CCW's request for a public hearing in a nine-to-two vote. The WQCC issued a final order pursuant to Section 74-6-5(Q) and 20.1.3.16(F)(3) NMAC, setting out its findings of fact and conclusions of law. It is CCW's appeal of the WQCC's decision that we now consider.

**STANDARD OF REVIEW**

{7} A decision of the WQCC will not be disturbed by this Court unless it acts in a manner that is: "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 74-

6-7(B). "A ruling that is not in accordance with law should be reversed if the agency unreasonably or unlawfully misinterprets or misapplies the law." *N.M. Mining Ass'n v. N.M. Water Quality Control Comm'n*, 2007-NMCA-010, ¶ 11, 141 N.M. 41, 150 P.3d 991 (internal quotation marks and citation omitted). However, in considering whether the WQCC's actions were in accordance with the law, we note that interpretation of a statute is a matter of law that this Court reviews de novo, and we are not bound by NMED's or WQCC's interpretation of the relevant statutes. *See id.* (citing *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806).

## DISCUSSION

**{8}** Initially, we note that our review does not include a review of the merits of the permit. Instead, we limit our review to the procedures employed by NMED to grant the permit and whether they were implemented in accordance with the applicable statutes and regulations.

**{9}** The parties' arguments focus on the discretion of the secretary to deny a request for a public hearing on a draft permit under the Act and its promulgated regulations. While Section 74-6-5(G) (the statute) appears on its face to provide for a public hearing, stating, "[n]o ruling shall be made on any application for a permit without opportunity for a public hearing at which all interested persons shall be given a reasonable chance to submit evidence, data, views or arguments orally or in writing and to examine witnesses testifying at the hearing," 20.6.2.3108(K) NMAC (the regulation) promulgated to effectuate the statute appears to limit the availability of a hearing to instances where a hearing is requested and the secretary finds a substantial public interest in the permit application. The regulation states,

> Requests for a hearing shall be in writing and shall set forth the reasons why a hearing should be held. A public hearing shall be held if the secretary determines there is substantial public interest.

20.6.2.3108(K) NMAC; *see also* 20.6.2.7(PP) NMAC (identifying the regulation's references to "the secretary" as references to the secretary of NMED).

**The Act and WQCC Regulations**

**{10}** In its passage of the Act, the Legislature gave the WQCC, as New Mexico's water pollution control agency, the responsibility of creating and implementing regulations aimed at preventing water pollution. *See* § 74-6-1; § 74-6-3; § 74-6-4. The Act requires the WQCC to adopt regulations governing the application for, public notice of, and the granting of, water quality permits. *See* § 74-6-5(D) ("After regulations have been adopted for a particular industry, permits for facilities in that industry shall be subject to conditions contained in the regulations."); Section 74-6-5(F) ("The commission shall by regulation develop procedures that ensure that the public . . . shall receive notice of each application for issuance, renewal

4

or modification of a permit."); Section 74-6-5(J) (granting the commission authority to impose conditions upon permits by regulation). Utilizing these powers, the WQCC promulgated regulations governing the NMED's duties to provide notice of permit applications to the public and established the circumstances under which members of the public are entitled to a public hearing on a permit application. *See* 20.6.2.3108 NMAC (setting out public notice and participation requirements). Specifically, the regulations promulgated by the WQCC provide for a public hearing on a permit application only after receipt of a written request setting out the reasons a hearing should be held and a determination by the secretary that a substantial public interest exists. *See* 20.6.2.3108(K) NMAC.

{11}     The regulations promulgated by the WQCC provide that once the two regulatory prerequisites to a public hearing are satisfied, the hearing on a proposed discharge permit is intended to be conducted as a "fair and impartial adjudication of issues" in front of a hearing officer, who is tasked with assuring that "the facts are fully elicited[.]" 20.6.2.3110(E) NMAC. During a public hearing, the permit applicant presents testimony and undergoes examination in order to "prov[e] the facts relied upon . . . justify the proposed discharge plan, . . . and meet[] the requirements of the regulations[.]" 20.6.2.3110(G)(1) NMAC. All technical witnesses—both supporting or opposing issuance of the permit—then present testimony and are subject to examination, after which the general public may testify, and the permit applicant may present rebuttal testimony. *See* 20.6.2.3110(G)(2)-(4) NMAC. During the hearing, "all persons shall be given a reasonable chance to submit data, views or arguments orally or in writing and to examine witnesses testifying at the hearing." 20.6.2.3110(F) NMAC. "[T]he hearing officer may allow proposed findings of fact and conclusions of law and closing argument." 20.6.2.3110(I) NMAC. The hearing officer must then issue a report, which is available for public inspection, and presented to the secretary, who then issues a decision on the matter. *See* 20.6.2.3110(K), (L) NMAC.

{12}     Once those proceedings have concluded, a person who participated in the permitting action and is adversely affected by the grant, denial, termination, or modification of a permit may file a petition for review before the WQCC. *See* § 74-6-5(N), (O). Upon receipt of a timely written petition that details the issues to be raised and relief sought, the WQCC must hold a review proceeding. *See* § 74-6-5(O), (P). The WQCC is required to give public "notice of the date, time and place for the review" proceeding. Section 74-6-5(P). If, prior to the review proceeding, "a party shows to the satisfaction of the [WQCC] that there was no reasonable opportunity to submit comment or evidence on an issue being challenged," the WQCC is required to order that NMED take additional comment or evidence. Section 74-5-6(R). As part of review proceedings, the WQCC reviews the record compiled before NMED, including the transcript of any public hearing, and must allow "any party to submit arguments." Section 74-6-5(Q). The WQCC then enters findings of fact and conclusions of law sustaining, modifying, or reversing NMED's actions, "[b]ased on [its] review of the evidence, the arguments of the parties and recommendations of the hearing officer[.]" Section 74-6-5(Q).

**Opportunity for a Public Hearing**

**{13}**     The parties agree that the statute precludes NMED from ruling on a permit application until interested parties are given an "opportunity for a public hearing[.]" Section 74-6-5(G). They disagree, however, on the meaning of the phrase "opportunity for a public hearing." Specifically, the parties disagree as to whether the opportunity for a public hearing mandates a hearing or gives the secretary discretion to deny a request for a public hearing.

**{14}**     When construing a statute, "a reviewing court's central concern is to determine and give effect to the intent of the [L]egislature." *Public Serv. Co. of N.M. v. N.M. Pub. Util. Comm'n*, 1999-NMSC-040, ¶ 18, 128 N.M. 309, 992 P.2d 860 (internal quotation marks and citation omitted). Courts traditionally follow three canons of construction. First, "[t]he plain language of a statute is the primary indicator of legislative intent." *Id.* (internal quotation marks and citation omitted); *DeMichele v. N.M. Taxation & Revenue Dep't*, 2015-NMCA-095, ¶ 14, 356 P.3d 523 ("The plain meaning rule presumes that the words in a statutory provision have been used according to their plain, natural, and usual signification and import, and the courts are not at liberty to disregard the plain meaning of words in order to search for some other conjectured intent." (omission, internal quotation marks, and citation omitted)). Second, words carry their ordinary meaning unless it is clear the Legislature meant otherwise. *See id.* Third, we do not read into a statute language that is not there, "especially when it makes sense as it is written." *Id.* (internal quotation marks and citation omitted). We must construe the entire statute so that all provisions are considered in relation to one another. *See Starko, Inc. v. N.M. Human Servs. Dep't*, 2014-NMSC-033, ¶ 35, 333 P.3d 947; *N.M. Mining Ass'n*, 2007-NMCA-010, ¶ 12. Furthermore, regulations in the New Mexico Administrative Code are interpreted using the same rules applied in statutory interpretation. *Carrillo v. My Way Holdings, LLC*, 2017-NMCA-024, ¶ 22, 389 P.3d 1087. Finally, while rules, regulations, and standards enacted by an agency are presumed valid if they are reasonably consistent with the authorizing statutes, *id.*, "the administrative agency's discretion may not justify altering, modifying, or extending the reach of a law created by the Legislature." *State ex rel. Stapleton v. Skandera*, 2015-NMCA-044, ¶ 8, 346 P.3d 1191 (alterations, internal quotation marks, and citation omitted).

**The Secretary Has Discretion to Hold a Hearing Under Section 74-6-5**

**{15}**     The provisions of the Act evidence the Legislature's intent to include the public in the permit application, issuance, and implementation process. The Act is replete with opportunities for public participation, evidencing the Legislature's intent that the public actively participate in protecting New Mexico's ground and surface water from pollution. *See* § 74-6-5 (calling for public notice and public participation throughout the permitting process); Section 74-6-6(A) (requiring a public hearing prior to the adoption, amendment, or repeal of regulations and water quality standards); Section 74-6-4(H) (requiring a public hearing prior to granting variance); Section 74-6-15(A) (making records, reports, and information obtained by the WQCC or NMED pursuant to the Act "generally available to the public"); Section 74-6-10(G) (allowing for a public hearing in compliance order context).

6

It is with this legislative intent to provide for robust public participation throughout the permitting process in mind, that we interpret the language of Section 74-6-5(G). *See State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352 (stating that statutes should be interpreted to achieve the Legislature's purpose).

**{16}** The language of the statute provides no clues as to the Legislature's intended meaning of the phrase, "opportunity for a public hearing." Rather than consider the meaning of the term "opportunity for a public hearing," in isolation, however, we consider the statute in its entirety. *See State ex rel. People's Bank & Tr. Co. of Las Vegas v. York*, 1918-NMSC-118, ¶ 6, 24 N.M. 643, 175 P. 769 ("In the construction of a statute, in order to determine the true intention of the Legislature, the particular clauses and phrases should not be studied as detached and isolated expressions, but the whole and every part of the statute must be considered in fixing the meaning of any of its parts." (internal quotation marks and citation omitted)).

**{17}** CCW argues that the WQCC and NMED incorrectly interpreted the regulation in such a way that the regulation conflicts with the statute. Specifically, CCW argues that, under the statute, the secretary has no discretion to refuse a request for public hearing on a discharge permit application and NMED's denial of its hearing request was not in accordance with the law. Alternatively, CCW argues that if NMED had discretion to refuse a public hearing request, that discretion is limited to circumstances where there was no substantial public interest, which CCW claims was not the case in this instance. In response, LANS and the WQCC argue that the discretion given to the secretary in 20.6.2.3108(K) NMAC does not conflict with Section 74-6-5(G) because requiring an "opportunity for a public hearing" is not a guarantee that a hearing will take place and that the regulation's substantial public interest standard was properly applied in denying CCW's request.

**{18}** While CCW contends that a public hearing is mandatory under the plain meaning of the statute, LANS argues that "opportunity" connotes possibility, rather than certainty. Further, the WQCC points out that while other sections of the Act use words like "shall" to evidence the Legislature's clear intent that a public hearing is mandatory, Section 74-6-5(G) contains no such compulsory language. Instead, the WQCC contends Section 74-6-5(G) places the decision of whether to hold a hearing within NMED's discretion. Measuring Section 74-6-5(G)'s language against language used elsewhere in the Act, we agree with the WQCC that the Legislature's plain language indicates an intent to grant some degree of discretion as to whether to hold a public hearing. Indeed, elsewhere in the Act, the Legislature makes absolutely clear that a hearing is required, specifying that the WQCC "*shall* conduct a public hearing" within a certain time frame after receiving a request. *See* § 74-6-10(G); *see also* § 74-6-5(P) (stating the WQCC "shall consider the petition within ninety days after receipt of the petition"). By comparison, the Legislature's election to provide an "opportunity" for a hearing, rather than a mandate, suggests that a hearing is not always required.

**{19}** LANS points to similar provisions within the Federal Clean Water Act and

7

accompanying Environmental Protection Agency (EPA) regulations and urges us to follow federal law when interpreting our statute and the accompanying regulation. Just as the Act requires that interested persons be given an "opportunity for a public hearing," Section 74-6-5(G), the Federal Clean Water Act provides that "the Administrator may, after opportunity for public hearing issue a permit for the discharge of any pollutant[.]" 33 U.S.C. §1342(a)(1) (2012). The companion federal regulation provides that the "Director shall hold a public hearing whenever he or she finds, on the basis of requests, a significant degree of public interest in a draft permit[.]" 40 C.F.R. §124.12(a)(1) (2012); *see also* 40 C.F.R. 124.2(a) (2012) (defining "Director" as the regional administrator of an EPA regional office, chief administrative officer of a state agency, or tribal director).

**{20}** The United States Supreme Court interpreted the Federal Clean Water Act's requirement for an "opportunity for public hearing" and its accompanying EPA regulations in *Costle v. Pacific Legal Foundation*, 445 U.S. 198 (1980). In *Costle*, the Supreme Court considered whether the Federal Clean Water Act required the EPA to conduct a hearing before modifying a permit to extend its expiration date when notice of the proposed modification was given, but no one submitted comments or requested a hearing. *Costle*, 445 U.S. at 213. The EPA issued a final determination extending the expiration date of the permit without holding a hearing, *Costle*, 445 U.S. at 205-209, arguing that it was "entitled to condition the availability of a public hearing . . . on the filing of a proper request." *Id.* at 213. The Court explained that the relevant regulations "were designed to implement the statutory command that permits be issued after *opportunity* for public hearing[,]" *id.* at 214 (internal quotation marks and citation omitted), and noted that it had previously held that "a similar statutory requirement that an 'opportunity' for a hearing be provided may be keyed to a *request* for a hearing." *Id.* (citing *Nat'l Indep. Coal Operators' Ass'n v. Kleppe*, 423 U.S. 388, 398-99 (1976). Balancing the fact that a rule requiring hearings on all agency permitting actions, "would raise serious questions about the EPA's ability to administer the [permit] program[,]" *Costle*, 445 U.S. at 215, with the clear legislative history of "congressional desire that the public have input in decisions concerning the elimination of water pollution[,]" *id.*, the Court held "that the regulations the EPA has promulgated to implement this congressional policy are fully consistent with the legislative purpose, and are valid." *Costle*, 445 U.S. at 216.

**{21}** The Court also expressed disagreement with the lower court's interpretation of the statute that, according to the Court, rendered the EPA regulation "essentially meaningless" by requiring the EPA to prove the material facts of the action, notwithstanding that they were not subject to dispute. *Costle*, 445 U.S. at 214. Instead, the Court pointed with approval, to past decisions in which similar agency rules "required an applicant who seeks a hearing to meet a threshold burden of tendering evidence suggesting the need for a hearing." *Id.* (citing *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 620 (1973)). In *Weinberger*, the United States Supreme Court considered similar language found in the Federal Food, Drug, and Cosmetic Act (FDCA) related to the withdrawal of a new drug application (NDA). The FDCA "requires [the] FDA to give 'due notice *and opportunity for hearing* to the applicant' before it can withdraw its approval of an NDA." *Weinberger*, 412 U.S. at 620

(emphasis added) (internal quotation marks and citation omitted). In furtherance of its obligation to provide notice and an opportunity for hearing on NDAs, the FDA promulgated regulations related to the instances in which an opportunity for a hearing would be provided under the FDCA. *Weinberger*, 412 U.S. at 620-21. To be entitled to a hearing, according to the FDA regulations, applicants must meet a threshold showing that includes evidence that, on its face, meets the statutory standards, as particularized by the regulations. *Weinberger*, 412 U.S. at 620. Noting that applicants have "full and precise notice of the evidence they must present to sustain their NDA's," the Court held that the regulations were "unexceptionable on any statutory or constitutional ground." *Weinberger*, 412 U.S. at 622. The Court, quoting from *Federal Power Commission v. Texaco*, 377 U.S. 33, 39 (1964), noted, "[T]he statutory requirement for a hearing . . . does not preclude the Commission from particularizing statutory standards through the rulemaking process and barring at the threshold those who neither measure up to them nor show reasons why in the public interest the rule should be waived." *Weinberger*, 412 U.S. at 620.

**{22}**     After examining the plain language of the statute in relationship to the rest of the Act and considering the United States Supreme Court's interpretation of similar language, we are persuaded that the Legislature intended to confer limited discretion on the secretary to determine whether a hearing should be held on a permit application under the Act. We now consider the scope of that discretion.

**Scope of Secretary's Discretion**

**{23}**     The regulation contains two threshold requirements that must be satisfied before a party is entitled to a public hearing on a permit application. First, a party must submit a request in writing, setting forth the reasons a hearing should be held. 20.6.2.3108(K) NMAC. We note that the parties have voiced no quarrel with the regulatory requirement that a request for hearing must be written and must set out the reason why the hearing should be held,  and we hold that the plain language of the statute does not preclude the secretary from requiring that a party submit such a written request. *See Costle*, 445 U.S. at 214 (acknowledging that a party's opportunity for public hearing "may be keyed to a *request* for a hearing").

**{24}**     The regulation further requires that, before a party is entitled to a public hearing, the secretary must determine there is a substantial public interest in the matters that are the subject of the permit application. 20.6.2.3108(K) NMAC. The WQCC issued conclusions of law as part of its final order, concluding that the secretary had properly considered the public interest in denying CCW's request for a hearing on the permit. We now consider whether those conclusions were supported by substantial evidence.

**{25}**     The regulation fails to define "substantial public interest" and fails to set out any particularized standards the secretary should consider in deciding whether a party requesting a hearing has satisfied this requirement. *See Weinberger*, 412 U.S. at 620 (citing *Texaco*, 377 U.S. at 39). Both CCW and NMED argue that a determination of substantial public interest

9

is a substantive, or qualitative, inquiry. CCW argues that the WQCC abused its discretion in upholding the secretary's denial of its hearing request because the secretary's decision that there was no substantial public interest in the permit is not supported by substantial evidence in the record. Pointing to *Republican Party of New Mexico v. New Mexico Taxation & Revenue Department*, 2012-NMSC-026, ¶ 10, 283 P.3d 853 (stating "substantial public interest," as an issue of "public importance"), CCW contends that something is of substantial public interest when the issues raised are substantive, are of considerable size, weight, and importance, address the "essentials of the matter at issue," and are real and tangible. Both LANS and the WQCC argue that CCW failed to demonstrate a substantial public interest, and the secretary therefore acted within his discretion to deny CCW's request for public hearing. NMED suggests that the reference to "substantial" encompasses the "quality of the concerns that are raised" while "public" refers to anyone "not part of the government." We need not determine the meaning of substantial public interest or define what factors make up a substantial public interest determination under the regulation because we hold the factors cited by the WQCC to uphold the secretary's denial of a hearing have no bearing on any such analysis and that the WQCC's decision to affirm the secretary's denial of CCW's hearing request was not supported by substantial evidence.

**WQCC's Decision**

{26} In denying CCW's request for a hearing on the permit, the WQCC took note of three factors. First, the WQCC noted that the issues for public hearing were raised by a "sole participant whose concerns had been repeatedly addressed by the Bureau, DOE and LANS throughout the permitting process." Second, the WQCC commented that the permit "will allow DOE to begin to remediate [a] contaminated groundwater plume within the boundaries of LANL [, and d]elaying the remediation of contaminated groundwater could therefore be harmful to both public health and the environment." Finally, the WQCC pointed out that CCW "never challenged the merits of [the permit]." Based on these three factors, WQCC determined that, "[t]he totality of the evidence contained in the record sufficiently supports the conclusion that the [s]ecretary properly determined any remaining concerns of that sole participant failed to rise to the level of substantial public interest." We address each of these factors in turn.

{27} With regard to WQCC's finding that CCW was a sole participant whose concerns were addressed, our concern is two-fold. We initially question the relevance of WQCC's characterization of CCW's request as a challenge by a "sole participant" in light of the parties' agreement that "substantial public interest" is a qualitative analysis, not a quantitative one. However, even if "substantial public interest" were to be a quantitative analysis, the WQCC's characterization of CCW as a "sole participant" seems contrary to its acknowledgment that CCW is a coalition of six organizations, including Concerned Citizens for Nuclear Safety, Amigos Bravos, Honor our Pueblo Existence, the New Mexico Acequia Association, the Partnership for Earth Spirituality, and Tewa Women United. As such, WQCC's finding of a "sole participant" is not supported by the evidence.

10

**{28}** Further, the WQCC's rationale that the request for hearing was made by a participant, "whose concerns had been repeatedly addressed by the Bureau, DOE and LANS," lends little support to its conclusion that CCW failed to show a substantial public interest in light of the legislative intent in favor of broad public participation in the permitting process. In its final order, the WQCC reasoned that the Bureau's "substantive responses" to CCW's concerns were effective in diminishing the level of public interest in the permit application. NMED's ability to provide substantive responses to CCW's concerns stands completely separate from a consideration of whether those concerns demonstrated a substantial public interest. Indeed, nothing in the statute or regulations suggests that NMED may ameliorate concerns regarding a permit through private meetings in lieu of a properly requested public hearing, particularly if a party has demonstrated a substantial public interest.

**{29}** Through its three requests for public hearing, CCW raised procedural and substantive issues involving the permit application, including the calculation and application of discharge limits, the basis for treatment standards, soil sampling requirements, the use and impact of radioactive materials, and the definition and implementation of "work plans." CCW's requests for public hearing, rather than state general objections or concerns, present detailed articulations of reasons that CCW was dissatisfied with specific language and calculations in, and omissions from the permit. The issues raised in CCW's requests were substantial enough to warrant a meeting on April 15, 2015, between CCW, NMED, and DOE/LANS, during which the parties discussed concerns with and alterations to the permit, and after which, the Bureau issued a revised draft permit. There is no recording or transcript of the meeting in the record, and it does not appear that the general public was given notice of this meeting or an opportunity to participate.

**{30}** The WQCC's conclusion that CCW's concerns were substantial enough to justify a private meeting among the parties and revisions to the draft permit but not enough to require a public hearing, is unpersuasive. A review of the public hearing standards, as set forth in the statute and regulations, quickly reveals that a private meeting is not equivalent to a public hearing. The public hearing is a persuasive proceeding, imposing the burden of persuasion upon the permit applicant. The public hearing provides opponents to a permit application an opportunity to present contrary evidence and testimony, to cross-examine expert witnesses, to present their own expert testimony, to argue their objections to the permit, and to obtain a decision based on the evidence. Public hearings are intended to give the public an opportunity to challenge a permit application and create a record to appeal an adverse decision. *See* § 74-6-5(O)-(Q). As review proceedings are based exclusively on the record and arguments made at the public hearing, a party having shown the existence of a substantial public interest in the permit application is dependent upon the public hearing to make its record in support of any necessary appeal. *See id.*

**{31}** A private meeting followed by written responses to concerns where an opponent has no opportunity to cross-examine witnesses, present its own experts and make a record for appeal is not a substitute for a public hearing. Such closed-door proceedings are not only insufficient to satisfy established standards for public hearings, but are contrary to the

11

legislative intent behind a statute that favors public participation in the permitting process. In light of the foregoing, the WQCC's reasoning—suggesting that NMED's response expunged the substantial public interest that may have existed prior to the response—is unpersuasive. We conclude the WQCC lacked substantial evidence to support its conclusion that CCW failed to show a substantial public interest because its concerns were addressed elsewhere throughout the permitting process.

**{32}** The WQCC's second factor in denying CCW's hearing request—that the delay caused by requiring a public hearing could be harmful to public health and the environment—also fails to support its decision to uphold the secretary's denial of CCW's hearing request for lack of substantial public interest. Indeed, to deny a public hearing because the public health and environment issues are so grave and immediate weighs in favor of the existence of a substantial public interest. If anything, this factor supports a conclusion that the public interest in the permit would be heightened, rather than lessened, mandating the hearing under the regulation.

**{33}** WQCC's final factor in upholding the secretary's denial of CCW's request for hearing was that CCW's failure to challenge the permit on its merits constituted a waiver of its right to complain that it had wrongfully been denied a public hearing. On appeal, NMED argues that CCW waived its right to challenge the secretary's denial of public hearing for two reasons. First, relying on the WQCC's conclusion, NMED contends CCW waived its right to appeal the hearing denial because it failed to challenge the permit on its merits. We note, however, that CCW did make substantive challenges to the permit in its requests for public hearing. Without the opportunity to present witnesses and cross-examine the applicant's witnesses at a public hearing, however, any attempt to challenge the permit on its merits is of little value, as such a challenge is limited to the review of the record created at the public hearing. *See* § 74-6-5(Q). Absent a public hearing, any challenge to the merits of the permit could not be fully developed and is useless.

**{34}** Second, NMED claims that CCW forfeited its opportunity to object on the grounds that it was denied the chance to develop a record because it did not avail itself of the "safety valve" built into Section 74-6-5(R) that allows the WQCC to send a permit back to NMED for "additional comment or evidence." *Id.* Nothing in the language of the statute, however, sets forth such a requirement. Absent language to suggest that the Legislature intended such a result, we decline to adopt such a prohibitive approach or to make pursuit of that review mandatory. *See Pub. Serv. Co. of N.M.*, 1999-NMSC-040, ¶ 18 (acknowledging that we do not read into a statute language which is not there, especially if it makes sense as written).

**{35}** The WQCC's three stated factors for sustaining NMED's denial of CCW's request for a public hearing fail to include an evaluation of factors relevant to a substantial public interest. By contrast, CCW set out detailed explanations about its relevant concerns with the permit, all of which were in the record before the WQCC. We therefore conclude that the WQCC acted contrary to the evidence and thereby acted arbitrarily and capriciously when it sustained the secretary's denial of CCW's request for a public hearing.

**{36}** The WQCC makes one final argument, contending that its interpretation, and therefore implementation, of the statute and regulations should be entitled to deference. We disagree. The scientific complexities of discharge permits may lie outside this Court's expertise, obligating deference to the agency's expertise in the creation of and justification for those standards. The protection of the adversarial process by which those complexities are presented, challenged, and implemented, however, is well within this Court's charge. *See Rio Grande Chapter of the Sierra Club*, 2003-NMSC-005, ¶ 17 (declining to defer to the commission on matters of law).

**CONCLUSION**

**{37}** We reverse the WQCC's decision sustaining NMED's denial of CCW's request for public hearing, and we remand for further proceedings consistent with this opinion.

**{38}** **IT IS SO ORDERED.**

_____
**JULIE J. VARGAS, Judge**

**I CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

**HENRY M. BOHNHOFF, Judge (specially concurring).**

**BOHNHOFF, Judge (specially concurring).**

**{39}** I concur in reversing the Commission's decision. However, I reach that result on different grounds than those articulated by the majority.

**{40}** Section 74-6-5(G), provides: "No ruling shall be made on any application for a permit without opportunity for a public hearing at which all interested persons shall be given a reasonable chance to submit evidence, data, views or arguments orally or in writing and to examine witnesses testifying at the hearing." The decisive question is whether, so long as a hearing is requested by an interested person, Section 74-6-5(G) allows the secretary to exercise any discretion in deciding whether to hold one. I conclude that it does not. As used in the statute, "opportunity for a public hearing" means that a hearing request is a predicate or precondition to requiring the secretary to hold a hearing, but it does not authorize the secretary to exercise any discretion to not hold a hearing for any other reason. (While the secretary may have discretion to choose to hold a hearing even in the absence of a request—a question we need not resolve—it would not be accurate to state that he or she has discretion in granting a hearing where one is requested, because he or she has no choice in the matter.).

13

**{41}** The primary consideration in construing the statute is the plain meaning of "opportunity for a public hearing." *See Cummings v. X-Ray Assocs. of N.M., P.C.*, 1996-NMSC-035, ¶ 44, 121 N.M. 821, 918 P.2d 1321 ("Our understanding of legislative intent is based primarily on the language of the statute, and we will first consider and apply the plain meaning of such language."). *Webster's Third Int'l Dictionary* (3d ed. 1976) defines "opportunity" as "a combination of circumstances, time, and place suitable or favorable for a particular activity or action" or "an advantageous circumstance or combination of circumstances[.]" It distinguishes "opportunity" from "chance" and in that context explains that " 'opportunity' indicates a combination of circumstances facilitating a certain action or inviting a certain decision[.]" *Webster's Third Int'l Dictionary*, *supra.* While Intervenor LANS suggests that "opportunity" means that there is only a chance: i.e., a possibility, of a hearing, this construction misconstrues the word. The more reasonable construction of "opportunity" as used in Section 74-6-5(G) is that a hearing will be held so long as an interested party requests one. That is, the only "favorable circumstance" or predicate to holding a hearing is the interested party's request.

**{42}** As discussed by the majority, such a construction also is consistent with the overall legislative intent or goal of encouraging public participation in permitting decisions.

**{43}** "Whenever possible, we must read different legislative enactments as harmonious instead of as contradicting one another. . . . Statutes which relate to the same class of things are considered to be in pari materia[.]" *State v. Tafoya*, 2010-NMSC-019, ¶ 10, 148 N.M. 391, 237 P.3d 693 (alterations, first omission, internal quotation marks, and citations omitted). Carefully read, the other statutes that address public hearings in connection with water quality regulation matters do not suggest that "opportunity for a public hearing" as that term is used in Section 74-6-5(G) grants the secretary discretion to deny a hearing if one is requested. First, Section 74-6-5(P) does not appear to contemplate a "hearing" at all, as opposed to a meeting of the Commission—presumably the only or at least usual way it acts—at which a petition to review a permitting decision will be considered. *See id.* ("If a timely petition for review is made, the commission shall consider the petition[.] . . . The commission shall notify the petitioner . . . by certified mail of the date, time and place of the review."). Second, Section 74-6-4(H) mandates a hearing on any application for a variance. *See id.* ("[The commission] may grant an individual variance from any regulation[.] . . . The commission shall adopt regulations specifying the procedure under which variances may be sought, which regulations shall provide for the holding of a public hearing before any variance may be granted[.]"). But this can be understood to mean simply that the Legislature deems variances of sufficient importance to require a hearing even absent a request for one. Without more, it does not support the conclusion that the different wording of Section 74-6-5(G) connotes anything more than that the grant of a hearing on a permit application is conditioned on a request. Third, Section 74-6-6(B) provides that "[a]ny person may petition in writing to have the commission adopt, amend or repeal a regulation or water quality standard. The commission shall determine whether to hold a hearing within ninety days of submission of the petition." This language suggests that, if the Legislature intends to give an agency discretion in granting a hearing, it will so state expressly. Fourth, the structure and

14

syntax of Section 74-6-10(G), would appear to be dictated by the need to make clear that a compliance order will always become final unless a request is made, as well as by the intent to afford the subject of the order an opportunity to be heard. *See id.* ("Any compliance order issued by a constituent agency pursuant to this section [regarding compliance orders] shall become final unless, no later than thirty days after the compliance order is served, any person named in the compliance order submits a written request to the commission for a public hearing. The commission shall conduct a public hearing within ninety days after receipt of a request."). A water quality permit is different—a permit is not automatically granted or denied if a hearing request is not made—which explains the different wording of Section 74-6-5(G). Thus, one cannot infer, on the basis of the difference in the language of Section 74-6-5(G) as opposed to that found in these other provisions, an intent to give the secretary discretion to deny a request for a permit hearing.

**{44}** The remaining argument for construing Section 74-6-5(G) to give the secretary discretion to grant or deny a request for a permit hearing is that such discretion is authorized by federal law. *See Costle*, 445 U.S. at 202-03 (construing federal Clean Water Act); *Weinberger*, 412 U.S. at 620 (construing federal Food, Drug, and Cosmetic Act); *Federal Power Comm'n*, 377 U.S. at 40. That proposition assumes that our Legislature considered these federal models when it enacted Section 74-6-5(G) in 1973; however, we have no information to that effect.

**{45}** Based on the foregoing, I interpret "opportunity for a public hearing" to mean that one will be held if an interested person requests one. For that reason I concur in reversing the WQCC's decision.

_____
**HENRY M. BOHNHOFF, Judge**
